UNITED STATES DISTRICT COURT

District of Vermont

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2023 AUG 22  AM 9: 57

CLERK

BY_____

Robert Lafayette, Plaintiff,

v.

Byron Robertson

Cara Caswell

Thomas Nuovo

Blueprint Basketball LLC,

Defendants

CIVIL ACTION NO: 2:23-cv-00167-gwc

AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL

PLAINTIFF'S COMPLAINT

Plaintiff, Mr. Lafayette (hereinafter referred to as "Plaintiff") files this action against Blueprint Basketball LLC (collectively, "Defendant") for Intentional Infliction of Emotional Distress, and respectfully alleges as follows:

I. INTRODUCTION AND CLAIM FOR RELIEF

1. Plaintiff, in this instance, seeks relief based on the precedent set in State Rubbish Collectors Association v. Siliznoff (1952)". In this case, the California Supreme Court broadened the definition of intentional infliction of emotional distress to include cases where serious emotional distress is intentionally caused by outrageous conduct, even in the absence of physical harm.

II. PARTIES

2. Plaintiff is a resident of Vermont.

3. Defendant is a duly constituted Limited Liability Company under the laws of Vermont, with its primary business location at, 31 Dunbar Drive, Essex Junction, Vermont 05452.

III. JURISDICTION AND VENUE

III. JURISDICTION AND VENUE

4.  This Court has jurisdiction over the subject matter based on the diversity of citizenship. Venue is rightly situated in this district per 28 U.S.C. § 1391 because the Defendant conducts significant business activities within this district, and the occurrence giving rise to this Complaint took place in this district.

IV. STATEMENT OF FACTS

5.  The chronological episodes pertinent to this claims are as follows:

    1.  In May of 2019 Mr. Lafayette son joined the Blueprint Basketball club.

    2.  In late May 2019 as assistant coach, Mr. Lafayette disclosed his traumatic brain injury sustained in 2018 and subsequent limitations to coaching with Blueprint Basketball. Blueprint provided at that time a reasonable accommodation, relieving Mr. Lafayette of game bookkeeping duties.

    3.  On June 4th at a Zero Gravity tournament Mr. Lafayette was denied entrance with his therapy animal, Ivan.

        [ Ivan is a black golden retriever/Labrador F1 who joined plaintiffs life after sustaining dual traumatic brain injuries and 14th concussion from basketball. Due to lack of papers for Massachusetts, Zero Gravity refused entry.]

    4.  At the June 4th event Mr. Lafayette was warned by a referee at a second game of the day.

        [ It's important to also note that officials are human, make errors and have emotions. This referee was on his 8th game of the day in extreme heat with 90% humidity. Admittedly Mr. Lafayette was upset the referee did not heed the safety concerns from the Blueprint coach as Mr. Lafayette sons was sustaining successive full body hits without intervention from officials.]

    5.  The official used racial stereotypes, referring to Mr. Lafayette as white-boy twice including the last second to last interaction when he race baited Mr. Lafayette in front of fellow parents, and with Mr. Lafayette being without ESA Ivan, to, "Shut up white-boy." The official instructed Mr. Lafayette to cease speaking.

        [The accosting and racial tones given Mr. Lafayette diagnoses Traumatic Brain Injury and Impulsivity Disorder tested Mr. Lafayette in a most profound way.

A.  Mr. Lafayette obliged the official request to stop making audible grievances of close calls or he would issue a "technical foul" to Mr. Lafayette.

B.  Mr. Lafayette complied and quietly began to video record the game as nearly all other parents routinely also capture.

C.  The official became agitated that Mr. Lafayette was now recording and came up to Mr. Lafayette to again instigate an adverse role, demanding to know why Mr. Lafayette was recording.

D.  Mr. Lafayette feeling directly targeted responded by advising that he wanted to one day show his grandchildren he had met the world's most cold garbage referee to ever live.

E.  The officials immaturity continued as he instructed Mr. Lafayette to leave the gym in its entirety, which despite obvious legitimacy reservations, Mr. Lafayette immediately complied with said order.]

6.  On Tuesday June 9th the director, Byron Roberson emailed to advise Mr. Lafayette was no longer allowed to be at practices, or games. He asked that Mr. Lafayette respond acknowledging receipt of the email.

[As the program does not record practices or games the ban would arrest the continued growth of Mr. Lafayette's son as a player. The subject of the email was program expectations, yet as of the date of that email no such program expectations were ever published or provided. Weeks into litigation Blueprint website thereafter reflected the new content, program expectations.]

7.  This communication was much more painful than a person who otherwise does not suffer from post TBI anxiety and panic attacks. Mr. Lafayette immediately called the director to discuss reasoning as

A.  This was the first time Mr. Lafayette was ever asked to leave by an official.

B.  The event took place out of state after ADA Reasonable Accommodation was denied and Blueprint has always been aware of the health challenges of Mr. Lafayette.

C.  Mr. Lafayette has always attended practices as other parents do and there was never a single incident.

D.  Seeking to explain to the racial baiting and stereotypes and the position of Mr. Lafayette.

8.  After not being able to reach BJ by phone/text Mr. Lafayette impulsive symptomatic behavior replied to the email and advised his disgust with this  decision.

9.  Immediately after Mr. Lafayette impulsive, symptomatic behavior wherein an email of criticisms to Blueprint was sent, Mr. Lafayette's son Jack was terminated from the program, and Mr. Lafayette was trespassed from the college based on entirely patently false claims by Cara Caswell and Blueprint Basketball.

10.  Blueprint co director Cara Caswell provided uncanny false narratives to both the Saint Michaels public safety and the Colchester Police to secure such a trespass. **[Exhibit A Cara Caswell reports to the police on the phone without being under oath that there is violence and threats being directed at the local college, prompting the Colchester to immediately dispatch cruiser. After, upon interview and now with penalty of perjury Ms. Caswell pivots, admitting that there were no threats, simply critiques.]**

11.  June 9th 2022,  Mr. Lafayette, to protect Mr. Lafayette son from missing out on the remainder of the year, emailed the VT Elite coach. As  Mr. Lafayette was planning to have his son reclass or redshirt due to his young age, would have been in 8th grade in the fall and so Mr. Lafayette  contacted the 7th grade coach. VT Elite was excited to welcome Jack.

12.  The Lafayette's were told to come starting this and every Friday 7-9 and Mondays 7-9. I explained how grateful we  were. While Jack was hurting from being dismissed without any participation in the reason for the dismissal from Blueprint and those relationships, he was taking comfort in rejoining VT Elite. Jack played one spring season with VT Elite.

13.  On June 12th after legal counsel, I began to explore with the police department via FOIA the logic and justification for a trespass order. The director, Mr. Roberson was CC'd.

14.  At approximately 9:13pm the same June 12th evening, I received an email from VT Elite coach advising  that Blueprint has put out an alert email about myself and son Jack. Evidently it appears the FOIA investigation triggered or gave Mr. Roberson an urge to further escalate the situation and he alone engaged in retaliatory measures. VT Elite coach said they could no longer accept Mr. Lafayette's son. At that point Mr. Lafayette emailed the VT Elite director, Sam Jackson. **(Exhibit B and C BJ Robertson and Blueprint**

**Basketball and Cara Caswell authored a public statement disclosing Mr. Lafayette's health and symptomatic behavior and encouraging all organizations to not accept Mr. Lafayette's son.)**

15. Sam advised Mr. Lafayette needed to work things out with BJ and that he "could not get involved another organization." Confirming the offer to join VT Elite is no longer on the table. Sam also made reference that Blueprint publicized the no trespass to all coaches in that email. This was in an apparent attempt to achieve Mr. Roberson goals that no team takes Mr. Lafayette's son and to isolate Jack.

16. On Monday at 7:22am Sam advised the Blueprint alert to all VT coaches via email contained "heavy concerns" and hoped I could "understand based upon what was released from Blueprint" to not get involved. He would also state "He feels bad for Jack whose stuck in the middle of a situation." **(Exhibit C Evidence of Resulting Harm From Blueprint Breach of Duty of Care, Dissemination of Personal Private Identifiable Information of Plaintiff)**

17. From August 2023 until early February several lawyers attempted to engage BJ Robertson and Cara Caswell and Blueprint Basketball attorney Tom Nuovo in an interactive process to create a reasonable accommodation instead of termination of both Mr Lafayette and his son. **(Exhibit D attorneys fruitless attempts to engage Blueprint to ultimately reach an arrangement which comports to law and stops the disability discrimination)**

18. After two attorneys had failed to illicit a response from Blueprint, VT Elite in April of 2023 permitted JL to attend but only at his grade level. JL would be named to the all-tournament team in the USA Open Qualifier Albany NY and received invitation to compete and train by two regional AAU programs by club directors. [These clubs are in Albany region and require a 3 hour drive both ways for Mr. Lafayette's son to realize proportionate playing opportunities equal to his Vermont peers.]

19. Attorney Nuovo has at all times directed his clients, aided and abetted all illegal discriminatory actions including the continued disability discrimination including the breach of duty of care and was the official who first brought the conception of a public email to defame and harm Mr. Lafayette and his son which was ultimately drafted, sent, received and acted upon.

20. Before the start of the fall 2023 season Blueprint provided scholarships to recruit away the other two players on the VT Elite 2026 team which also are Mr. Lafayette's sons' closest

friends and classmates. The scholarships were offered with surgical precision to ensure VT Elite would not have enough players to compete meaningfully and to further isolate Jack.

21. The outrageous acts against Mr. Lafayette's son directly resulted in Mr. Lafayette's unmanageable stress, extreme physical pain, aggravation of existing medical conditions, culminating in eight hospitalizations via ambulatory care, June 2022-March 2023. Exhibit E

## V. CAUSE OF ACTION

Count I - Negligent Infliction of Emotional Distress

6. Plaintiff repeats and reiterates paragraphs 1 through 5 as fully stated herein.

7. Due to the negligent behavior of the Defendant, the Plaintiff suffered severe emotional distress, physical harm resulting in eight hospitalizations from June 2022 to March 2023.

8. Physical Manifestation requiring hospitalizations and ongoing psychiatric care:

   A. JUL 1 2022 Emergency Department UVM Medical Center Emergency Department - Main Campus

   B. JUL 17 2022 Emergency Department UVM Medical Center Emergency Department - Main Campus

   C. AUG 8 2022 Emergency Department UVM Medical Center Emergency Department - Main Campus

   D. AUG 26 2022 Emergency Department UVM Medical Center Emergency Department - Main Campus

   E. DEC 7 2022 Emergency Department UVM Medical Center Emergency Department - Main Campus

   F. DEC 11 2022 Emergency Department UVM Medical Center Emergency Department - Main Campus

   G. FEB 27 2023 Emergency Department UVM Medical Center Emergency Department - Main Campus

   H. MAR 1 2023 Emergency Department UVM Medical Center Emergency Department - Main Campus

I. Ongoing psychiatric care by Dr. Hardy, expert witness at trial will demonstrate the direct link of the emergency department visits and Mr. Lafayette's mental health plight from the harm onto Mr. Lafayette's son and the child's chronic suffering.

REMEDY REQUESTED

WHEREFORE, Plaintiff, Mr. Lafayette, respectfully demands that this Court enter judgment against Defendant Blueprint Basketball LLC and award:

1. Compensatory and punitive damages;

2. Pre- and post-judgment interest as allowed by law;

3. The costs of bringing this action, including attorney's fees;

4. Summary judgement that the dismissal of Mr. Lafayette's son did not comport with ADA , see PGA Tour, Inc. v. Martin, 532 U.S. 661,  and enjoin Blueprint Basketball to reinstate Mr. Lafayette's son forthwith.

5. Such further relief as this Court may deem just and equitable.

Count II - Breach of Duty of Care

8. Plaintiff repeats and reiterates paragraphs 1 through 7 as if fully stated herein.

9. Defendant owed a duty of care to the Plaintiff, as established in the principles set out in Jackson v. Righter, 891 P.2d 1387 (1995) which confirmed that a duty of care arises when a relationship exists which gives rise to a legal obligation to act in a manner that it can reasonably be foreseen would injure others.

10. This relationship was breached when Defendant acted negligently, leading to Plaintiff's emotional distress.

REMEDY REQUESTED

WHEREFORE, Plaintiff, Mr. Lafayette, respectfully demands that this Court enter judgment against Defendant Blueprint Basketball LLC and award:

1. Compensatory damages;

2. Pre- and post-judgment interest as allowed by law;

3. The costs of bringing this action, including attorney's fees;

4.   Such further relief as this Court may deem just and equitable.

A jury trial is demanded on all counts so triable.

Dated this 20th day of August, 2023.
22nd

Respectfully submitted,

Robert Lafayette